United States Miss Honorable Court. Good morning. Let me first thank counsel for your cooperation through all of this. I know this is an unusual oral argument for our court, at least. I very much appreciate y'all's cooperation last week. I know it took some time out of your schedule, but thank you so much. And I also want to thank all of the people in our clerk's office and in our IT department who worked really, really hard nights over on weekends to make this possible. We very much appreciate it. Thank all of you for the great job that you've done. Our panel is hearing one case this morning. It is number 1920656. Ms. Coleman, you represent the EEOC. Good morning. Good morning, Your Honors. May it please the court. My name is Gail Coleman. I represent the EEOC. This is an appeal from an award of summary judgment. The district court was required to view all of the facts in the light most favorable to the EEOC and to make all reasonable inferences in the EEOC's favor. Nevertheless, the court uncritically accepted the defendant's version of the facts, ignoring vast portions of the record, calling all of those facts into question. Also, like the defendants continued to do on appeal, the district court used after-acquired evidence to justify the termination. Among the evidence was the district court completely overlooked with direct evidence of discriminatory comments about Villalobos' national origin. As soon as she was hired, Heman ordered DUSEX to work towards firing Villalobos to change the demographic of the community and the staffing and to replace her with Ken and Barbie. The defendant suggests that when DUSEX said this meant replace her with somebody white, that DUSEX was just speculating about what Heman meant. However, there is also evidence in the record and Heman later specifically clarified that he wanted white employees. That's at ROA2328 2329. DUSEX testified that she absolutely believed she would be fired if she did not comply with the discriminatory directive. That direct evidence standing alone is sufficient to defeat summary judgment. Moreover, even if that evidence is not considered direct but is circumstantial, it is compelling evidence of discrimination that also standing alone should much more circumstantial evidence. Heman complained over and over and over that the office staff were Mexican. He repeatedly expressed his anti-Mexican animus. He said he wanted the Mexican tenants out. He called Juan a trashy Mexican. He also made numerous discriminatory comments about African Americans, which reinforced the fact that when he said Ken and Barbie, he meant somebody white. Bloom, who was a co-owner, also made numerous discriminatory comments about Mexicans. While it's true that Bloom was not directly involved in the termination decision, he very well may have helped influence it because he was an owner. He was on weekly management conference calls with the other owners. He was around the property all the time. And a reasonable jury could infer that given all of those circumstances, he certainly may have expressed his views on replacing the property manager and what kind of a person she should be replacing. The court also completely ignored the existence of comments indicating animus against Villalobos for being pregnant. Justice warned her that her career was taking off and that if she had a baby, she would be jeopardizing her career. In fact, Dusek told her, I was in your situation once because I had an abortion. Dusek testified that when she said this, Villalobos asked for time off to have an abortion and that she gave her that time off. The district court took this as fact and characterized that as Dusek being understanding and supportive of the pregnancy. However, certainly granting leave for an abortion isn't quite supportive of a pregnancy. And Villalobos disputed that. She said that just flatly never happened. I told her I wasn't having an abortion. I was excited about this pregnancy and I wanted the baby. And in fact, she went on to have the baby. Bloom, again, who was a co-owner, also expressed his animosity, his negative reaction to the pregnancy, saying Villalobos would take the entire FMLA time off because all Mexicans do that. So from this, too, a reasonable jury could infer the pregnancy was the reason for the termination. Another compelling piece of circumstantial evidence that the district court completely ignored, as do the judges on appeal, never mentioned in their brief, is the suspicious timeline surrounding the termination. Dusek placed a super confidential ad with a headhunter for a replacement property manager on February 28th. That is three days after the February 25th delinquency report came out. That report showed that in just one month Villalobos had reduced delinquencies by $4,500. Nevertheless, three days later, they're advertising for her replacement. This was only weeks after Haman had instructed Dusek to work towards terminating Villalobos. Dusek interviewed Johnson the following day and secretly hired her only one week later, only after she had already hired Villalobos's replacement. She then purportedly warned Villalobos to include her performance. A reasonable jury could find that this is completely nonsensical. Why in the world would she warn Villalobos to include her performance when she had already hired Johnson? Villalobos denies that she ever received any warning, although the district court took as a fact that she did. A jury could also, in addition to the fact that Villalobos denied it, a jury could also conclude that the warnings never happened because Dusek conceded she admits that she backstated the verbal warning and she claims to have given a written warning on a day, on a week, when Villalobos was out on leave with her family because her children were on spring break that entire week. And even despite all this, if the jury believes that the warning happened on March 14th, it still makes no sense because that means Dusek then gave Villalobos only two work days following the written warning to include her performance. And during both of those work days, Dusek was in California. There is absolutely no evidence that she investigated how Villalobos performed while she was in California, yet the very day she came back, she fired her. On appeal, defendants have abandoned virtually all of their previous explanations for why they terminated Villalobos. They are now exclusively relying on time delinquency. A jury could reasonably conclude that this was false, not only from all of the circumstantial evidence that we've already discussed, but also because Dusek testified that she relied on the January, February, and March delinquency reports. The January and February reports show that Villalobos decreased delinquencies by $4,500. The March report did not come out until March 26th, four days after Dusek had already terminated Villalobos at Hayman's Detention Center. The fact that Dusek said that she relied on the March report and that defendants continue to cite that March report all through their brief on appeal is illogical. As you said, this is classic after-acquired evidence. An employer cannot rely on something it does not yet know about to justify a termination decision. That just makes no sense. Additionally, delinquencies were already high when Villalobos took over as property manager. Even Trayman testified that he believes it would be unfair to hold her responsible for problems that occurred on Rogani's watch. Defendants have claimed that Villalobos had many months to correct these deficiencies, but that is not true. ROA-1955 is a new hire sheet, and that sheet shows that Villalobos did not become the property manager until January of 2012, which is also confirmed by testimony elsewhere in the record. Prior to January 2012, Rogani served in a dual capacity. She was the property manager and also she was regional manager for a number of other properties that Hayman also controlled. She was the property manager, so it was not until January 2012 that Villalobos was responsible. She had only two and a half months in which to reduce delinquencies. Between January and February, which is all that defendants knew about at the time of her termination, she did reduce delinquencies. Defendants now compare her to Johnson, saying, look what a great job Johnson did when she took over. But what they're pointing to is Johnson's eight months to do. And again, they had given Villalobos only two and a half months before they fired her. Defendants emphasize, for some reason they call Dusek a disinterested witness and say a jury is required to believe everything she says. First of all, Dusek is not disinterested because she testified she absolutely believed she would be fired if she did not comply with what she knew to be a discriminatory directive. But in any event, whether or not she is disinterested, her testimony is certainly not uncontradicted or unimpeached. And therefore, a jury is not required to believe it under Reed. There are many reasons why a jury could find her not credible, beginning with the fact that she relied on the March 25th report, which did not yet exist at the time of the March 21st termination. Additionally, she testified that while Villalobos was property manager, there were no clean units to show to protective tenants. But then she testified, actually, yes, there were clean units. She testified that Villalobos submitted late invoices and that caused utilities to be shut off. But then she testified, actually, I don't remember when the utilities were shut off. I do know they were shut off several times after Villalobos left. Dusek secretly hired Johnson three days after the February 25th report showing lowered delinquencies, even though she claims that she fired her for delinquencies. And she secretly hired Johnson before warning Villalobos to improve her performance, assuming she actually did, in fact, give a warning. She admitted to backdating the verbal warning. She testified that she gave a written warning when Villalobos was on vacation. She testified that she gave Lee her an abortion when Villalobos flatly denied it. There are so many reasons for a district court to disbelieve Dusek. And finally, Dusek was not the final decision maker. She made a recommendation for whatever reason she made the recommendation, but she cannot know why Heyman said, okay, fire her. For all she knew, Heyman didn't care what she said one way or the other. He didn't have to believe it. He didn't need anything other than cover for a discriminatory decision that he had already made. A reasonable jury could certainly believe that when he said, fire her, I want someone white, that's what he meant and that's what he did. If the court has no questions, I respectfully urge that this court vacate the award of summary judgment and remand for further proceedings. Thank you. Mr. Russell. Thank you, Chief Judge Owen, and may it please the court. The court should affirm for two primary reasons, no direct evidence and no pretext. First, none of Dusek's statements about what the principal said to her constitute direct evidence because they require inferences and presumptions to conclude that the real reason on the ultimate termination decision was as opposed to the other two. Second, the appellants cannot show that the high rate of mental delinquencies was only a pretext for discrimination because Villalobos admitted that the high rate of mental disease was, quote, bad and, quote, never okay. Based upon those admissions and the other undisputed evidence that I'll get to in a minute, the employer's asserted justification for the appointment decision was not false. Under Reeves, the claims fail at the summary judgment stage. Additionally, the evidence that I just described in general is so strong that even if this court concludes the evidence, the Dusek statements describing the statements that she says were made to her, that evidence is so strong that summary judgment could still be granted under the Etienne case so long as any reasonable jury would conclude that the evidence showed that the termination decision still would have been made notwithstanding direct evidence or as was in the Fabella case, which was cited in the Etienne case, so long as you can prove that the improper criterion was not a basis for discrimination, summary judgment can be granted. And here, of course, the only reason for termination, and I should clarify, what's at the end in the Rodriguez versus Eli Lilly case reinforces that as to pretext, each of the legitimate reasons claimed by the employer must be proved to be false. Otherwise, you cannot show that discrimination was actually a real reason for termination. I think the best three cases for the court to look at in determining whether the statements that are listed in pages 27 through 29 of the EEOC briefs regarding any of these statements constituted direct evidence are the Etienne case, the Rodriguez versus Eli Lilly case, and Sandstat. I think the Etienne case is probably the closest on point. In there, the court analyzed two statements that were under the direct evidence analysis. Of course, the court talked about some of the four-factor, you know, stray remark analysis, but the ultimate focus, of course, is on whether those statements reflect reasonable presumptions. And the two Etienne were that the general manager who was accused of not promoting Etienne because of animus were that dark-skinned people would not be permitted to handle any money in the casino. The other statement was specific to Etienne. It was, quote, Etienne was to do various tasks at the casino. And it was only the statement in the affidavit of the former manager making these claims about what the general manager had said, it was only that statement that was specific to Etienne that was deemed to be direct evidence. Therefore, the allegations here about what was the logos. And the examples, of course, the reference to wanting to hire to change the demographics of the staff, first of all, that involves hiring. The ultimate termination decision here was the ultimate employment decision here was the termination, not the hiring. Additionally, the reference to Ken and Barbie, those two references, demographics and Ken and Barbie, are not specific. They require at least some inference and presumption on the part of what the intent was behind that. Additionally, the timing, I think, the statement that they were to work towards, that DUSEC was to work towards, requires a presumption that ultimately when the termination decision happened, which was almost a month and a half later, that it was in fact at that time based upon the racial animus. And just briefly, I'll mention in the Rodriguez case, that case involved a pharmaceutical sales representative who claimed disability discrimination because he had PTSD. There, there was an investigation to the HR department about whether he had misrepresented, whether he was meeting with doctors or whether he kept some insulin medication cool using some device that he was supposed to check the temperature twice a day, and some allegations about whether he was properly listing all of the people who attended dinners for reimbursement expenses. In the context of the investigation, Ramos, the HR manager, confronted him about some of those, said the investigation, and she, after he denied that it was something intentional, that it was a mistake, and she reached out to someone in management and basically said that she was concerned that Rodriguez was unstable. That was October 4th. He was terminated October 17th, and the court concluded that that was not causally related. That statement about him being unstable was not causally related to his ultimate termination. But even, the court said, even if that was deemed to be direct evidence, it was not sufficient to overcome the overwhelming evidence for, for legitimate reasons to terminate him, the basis of the investigation. Excuse me, when did you, when did you say that the statement was made that they should work towards terminating? The, I think the testimony, and I'll just give some record citations to, to the court, where the court can find that, find that. That's in the deposition testimony, which is, the key pages are 22 to, 2232 to 2233, and 2323 to 2329. And I think both parties can see that Dusek, I think actually it was her, says that she started on February 9th, 2012, and her deposition testimony confirmed that she was told just that one time, initially, when she began her position as the regional manager, that she should work towards, you know, terminating Villalobos. So 21 days later, she put in the ad in Confidential Headhunter, seeking to replace Villalobos. That's right. And what, and so once Dusek took over, though, she would have access to all of the delinquency reports, not just the monthly reports, of Villalobos' testimony, which is 1723 to 1741, the e-testimony in her deposition. She confirmed that the delinquency rates was something that she would report through their electronic software system every Monday. She'd call it the Monday morning report, and that would include, per her testimony, what the delinquency rates were. And those delinquency rates, by the way, the tenant would become delinquent, according to Villalobos' testimony, after the fourth, pursuant to the lease. So she would be able to tell after the heart of each month, and then every Monday thereafter, not only Villalobos, but so would Dusek, would be able to tell what the delinquency rates were. And so there were three Monday morning reports that Villalobos would have had to submit after February 9th, and three between February 9th and February 28th, when the ad was placed. And then an additional, I believe, two more Monday morning reports, as well as the monthly February 25th report, which showed that the delinquencies were over $7,100. And I think it's important for the court to look at Villalobos' testimony, where she said, as I mentioned in my opening, that when she was trying to recollect, remember this was March of 2016, when she was giving her deposition, Villalobos' deposition, her best recollection was that she said, quote, my delinquencies were between $5,000 and $8,000, and that either of those amounts would not be okay. And the $8,000 amount would be bad. So even if the delinquencies might have come down in February, $7,100 or $8,000, she conceded that those were never okay, and in fact, bad numbers. So that would have been the case. All of the witnesses confirmed that, all the non-principal witnesses, Raoghani, Dusak, Johnson, Villalobos, all agreed that those delinquency amounts were too much. How long did it take for Johnson to get below $5,000 to $8,000 in delinquency? I think her testimony was, it took her until November, so several months. But I think the Little v. Republic refining case from this court says that even if the judgment of the business judgment of the employer is incorrect about, in other words, maybe they were overly optimistic about how quickly Villalobos should have been able to get the delinquency rates down, the fact that they were overly optimistic about how quickly that could come down isn't a basis for discrimination, and this court doesn't second-guess the business judgment of the employer pursuant to that Little case I mentioned. And I think... Oh, there's no doubt, Mr. Russell, there's no doubt that direct evidence in the Title VII case is pretty rare, it's uncommon. In our court specifically, we construe direct evidence very rarely. There's some ambiguity there, some dots that need to be connected, maybe it could be construed to mean young or attractive or whatever, as opposed to an organization-related. But there seems to be some other evidence in the record that could be more fairly construed as direct. And what am I to do, what does the court do with something that the plaintiff was quickly told he wanted a white staff? I think that goes to Etienne. Etienne shows that dark-skinned Black people are not permitted to do... So there's a difference between a comment that we want to hire, you know, all the facts are true, Rebecca Johnson, it's still a disconnect between the facts of the case. You can determine the old one, which is a termination, and the comments about hiring white people, they may have had the desire to hire white people, but that's not directly related or commentally related, and was referenced in the Rodriguez decision, it wasn't... But I hope I've answered your question. I think that's all I can do right now, but I do want to move on. You can agree, but you can't fill a spot unless you have a spot to fill. You can't hire somebody unless there's a spot not open, potentially by firing somebody. Well, that's certainly a logical conclusion, but I think that's the assumption, or I'm sorry, presumption and inference that would be required to make this out of the context of direct evidence. But I want to make clear that even if this court concludes that this is one of those rare cases of direct evidence, when you do have one of those rare cases, it's also uncommon for there to be a situation where, despite there to be reasons for direct evidence, the court can still grant a summary judgment. It's not the point of the discussion case, the Etienne case, or the Fevella case. And the standard, again, to speak on that, I think Etienne is that it is direct evidence on discrimination. The court can give a summary judgment. A summary judgment is still appropriate so long as the indivisible jury would conclude that with a point of decision, it still wouldn't be made, notwithstanding the existence of the direct evidence. Fevella is often also considered in a way a summary judgment, and that is when the evidence conclusively produces that the improper criteria for auditing this indetermination decision is so huge. If you have the testimony of Dupnick, I can explain why I think this testimony does meet the needs of Roverson's test for being a disinterested witness. And you have to separate the two, just because something she said may not maybe fall into the specific evidence of her testimony that can be. And her testimony was predicted as to the fact that when she had that first meeting with Chief Judge on the interdiction question, and that first meeting made clear to the principals in the meeting that under no circumstances would she terminate anyone who does not deserve to be terminated. She acted as a firewall between whatever racial and ethnicities were being deduced from the statements that were said to her between February 9th and about. So, in her testimony on those points, which is, I would say a few things about this indeterminacy. She said she believed this would be terminated. She said absolutely. But her belief was not supported by any evidence. It was only a testimony from she said to suggest that she was threatened in some way, or that if she didn't follow up, she would be terminated. But ultimately, she said, if I found that she was all determined, I would have fought for that. And she said, I would have, I would have been fired. I would not have terminated somebody, somebody if they did not. That's page 22. I believe it's 2233. So, under both and a Bella case, if this court were to direct judgment, reasonable jury would have been made. I want to make one point. A disinterested witness, which is described in Reeves, and also described in this court, in Robertson, not every agent would be involved in the termination decision and have some knowledge about the rationale behind that termination decision. You can't have all that testimony. Otherwise, no summary judgment would ever be granted in favor of the employer. And here, I think it's important to understand the timing of the her own EEOC charge, and that's 2225 in the record, her own EEOC charge. After she's been terminated, she's making these second terms. So, I think it's hard to argue that not only is she probably adverse to the employer at that time, when she's giving her testimony in June of 2016. The key testimony is through a firewall between whatever racial animus she said, look, if I had been fired, would I have made other decisions other than to terminate? This court's judgment, all of the witnesses, the non-principal witnesses concluded were a basis for termination. And so, certainly under McDonnell-Douglas analysis, they can't prove that as a false ground, then the summary judgment would be granted under the circumstantial evidence. Mr. Russell Rogani testified that Mr. Blum told her that Heyman was really upset that the entire office staff was, quote, Mexican, unquote. She reported that he said this, quote, over and over and over again, unquote. I guess, number one, you can test, I assume that Mr. Heyman made those statements, but it would be relevant if he did. I just wonder, isn't that a disputed, a contested fact and it seems the same could be said about other statements that Heyman or Blum allegedly made around the time of Ms. Robo's termination. Chief Judge Jones, if I can, I'm sorry, Jones, I just finished it, bankruptcy appeal. Chief Judge Owen, can I answer that question? Okay. All right. Thank you. Judge Willett, those statements, first of all, they were not included in the EEOC. Those statements would be circumstantial evidence of we still then get back to the pretext factor, the pretext burden-shifting component. And the bottom line is rental delinquencies was a true fact. Villalobos admitted that the rental delinquencies was never okay. So that would have been a undisputed, uncontroverted, legitimate reason to terminate her, Villalobos, notwithstanding the comments that could be circumstantial evidence of pregnancy discriminations. So for those reasons, we believe the court should affirm if there's any other questions. Thank you, counsel. Thank you. Ms. Coleman. Again, this is an appeal from summary judgment. The EEOC does not need to show that a jury must rule for us. We only need to show that a reasonable jury could rule for us. Here, there is evidence. This was shown in the January, February, and March delinquency reports, and she said, I relied on these reports. A reasonable jury could conclude that she said what she meant, and she wasn't checking in every week with ongoing delinquency interim reports. In any event, we cannot lose sight of the fact that she advertised for a new property manager right after three days after looking at the February report. So even though certainly in February delinquencies were still high, and the EEOC does not dispute that, what she knew immediately before advertising for this new property manager was that delinquencies were coming down, that the EEOC had just succeeded in reducing them by $4,500. She hired Johnson on March 8th. So at most, she could have seen only one of these interim March reports at most, and it's highly unlikely that in one week, there would have been much difference between the in the February report and whatever she saw, if she saw anything before March 8th. I'd also note that the defendants have abandoned almost all of their arguments on appeal now. All they are relying on anymore is delinquency, but they have made a slew of other arguments in the district court about why they terminated the ELOBO, which is odd, and a jury can certainly read into that that if they had meant it in the first place, they would still be mentioning it now. A jury could conclude that they were throwing mud at the walls and none of it was sticking, and this is what they've seized on, and that alone, the shifting explanation is suspicious and is grounds from which a jury could rule for the EEOC. If the court has no further questions, the EEOC again respectfully requests that you vacate and we will take it under submission. The court will be adjourned until tomorrow morning at 10 o'clock.